Knut S. Johnson (SBN 125725)
kjohnson@singletonschreiber.com
**SINGLETON SCHREIBER, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel. (619) 771-3473

Marianna Sarkisyan (*Pro Hac Vice*
Pending)
msarkisyan@singletonschreiber.com
**SINGLETON SCHREIBER, LLP**
1641 N. Downing Street
Denver, CO 80218
Tel. (619) 604-3016

Kelly Hanker (SBN 257596)
kelly@TL4J.com
**TRIAL LAWYERS FOR JUSTICE, PC**
877 S. Victoria Avenue, Suite 201
Ventura, CA 93003
Tel. (310) 855-3727

Mark Bratt (SBN 246103)
mark@brattlawfirm.com
**THE BRATT LAW FIRM, PC**
145 S. Spring Street, Suite 850
Los Angeles, CA 90012
Tel. (833) 272-8847

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

MARIA MAGDALENA ALANIS, an individual; ROBERTO ADOLFO ALANIS, an individual; AUSTREBERTO ALANIS, an individual; JULIAN JOSE ALMARAZ, an individual; LAURA ANN ALMARAZ, an individual; BRIANA MARIE ALMARAZ, an individual; ROB C. BAGGALEY, an individual; LORRAINE BAGGALEY, an individual; KEVIN ROBINSON BARRETT, an individual; MICHELE (MIKELE) DIRENZO, an individual; SAGE LYNN BORGESE, an individual; BRENT STEVEN BORGESE, an individual; ANDERSON BOYCE, SR., an individual; ROSIE BOYCE, an individual; ANDERSON BOYCE, JR.; an individual; ALEJANDRO RIVERA CAMPOS SR., an individual; ALEJANDRO RIVERA CAMPOS JR., an individual; IRMA CAMPOS, an individual; RAMIRO CAPA, an individual; SUZANNE MARIE COLONNA individually and as Trustee of THE

Case No.

**COMPLAINT FOR DAMAGE**

1. **Trespass**
2. **Private Nuisance**
3. **Negligence**
4. **Negligence Per Se**
5. **Negligent Failure to Warn**
6. **Unjust Enrichment**
7. **Civil Conspiracy**

**DEMAND FOR JURY TRIAL**

1
COMPLAINT FOR DAMAGES

SUZANNE M. COLONNA REVOCABLE TRUST DATED NOVEMBER 21, 2015; CHARLES DEAN VUKOVIC, an individual; BALENTE CARDENAS, an individual; GRISELDA LOPEZ, an individual; KARINA CARDENAS, an individual; SANDRA CARDENAS, an individual; JIMMY JUAREZ, an individual; CAROLINA LOPEZ, an individual; JASMIN CARRILLO, an individual; JUAN GONZALEZ, an individual; LAISA CARRILLO, an individual; ERIC R. VACA, an individual; MARICELA H. CARRILLO, an individual; PEDRO CASIQUE CARRILLO, an individual; PEDRO CASIQUE CARRILLO, SR., individually and as Trustees of THE CARRILLO'S FAMILY REVOCABLE LIVING TRUST DATED AUGUST 10, 2023; MEGHAN ELIZABETH CARTER, an individual; AUSTIN JAMES KOWALCZYK, an individual; JOHN PATRICK CARTER, an individual; JESSICA ROUSSEL CHAMBERS, an individual; ANDREW T. CHAMBERS, an individual; JULIE ANNE CHECKETTS, an individual; COREY ROBERT CHECKETTS, an individual; AIDEN JAMES CHECKETTS, an individual; LETICIA DIAZ, an individual; DANTE ENRIQUE CERVANTES, an individual; RAYE MARIE DIAZ and RAYMOND ANTHONY DIAZ, individually and as Trustees of THE RAYMOND AND RAYE DIAZ LIVING TRUST; DEVIN MATTHEW DIAZ, an individual; KYLAH ELAINE DIAZ, an individual; GEORGE JOSEPH DIGIOVANNI, an individual; GINGER PAT DIGIOVANNI, an individual; EDWARD ANTHONY ELIAS, an individual; JAQUELIN CARDENAS, an individual; LUCAS ALLEN FARBER, an individual; NICOLE MARIE ELIAS, an individual; MARY ANNE GARCIA and RICHARD ADAIR GARCIA, individually and as Trustees of THE RICHARD A. GARCIA AND MARY ANNE GARCIA DECLARATION OF TRUST DATED OCTOBER 22, 2002; CARRIE IRENE HANKS, an individual; STEVEN MICHAEL HANKS, an individual; CHERYL A. HANKS, an individual; CHRISTOPHER ROBERT HANKS, an individual; ERIKA ANN WEINHOLD, an individual; RICHARD W. HUMANIC, SR. and VICKI JEAN HUMANIC, individually and as Trustees of THE RICHARD W. HUMANIC, SR. AND VICKI J. HUMANIC FAMILY TRUST U/D/T DATED SEPTEMBER 8, 2021; ELIZABETH

COMPLAINT FOR DAMAGES

VENULDA JEFFORDS, an individual; PAUL EDWIN KREYENHAGEN, individually and as Trustee of the PAUL KREYENHAGEN LIVING TRUST; LISA LYNN LANDY, an individual; RICHARD RYAN LANDY, an individual; MAX LEVY, an individual; JUSTIN MAURICE LOWENTHAL, an individual; AMANDA MARIE LOWENTHAL, an individual; PAUL J. LOWENTHAL, an individual; LISA JEAN LOWENTHAL, an individual; CHRISTINE HOFFMAN, an individual; ALEXANDREA RANAE MARIN, an individual; CHRISTIAN MARIN, an individual; KARINA MCAHREN, an individual; RYAN MCAHREN, an individual; DANIELLE NICOLE McCALL, an individual; JOYCE CLAUDEAN MELIUS, an individual; PAMELA BETH MELIUS, individually and as Trustee of THE PAMELA B. MELIUS REVOCABLE TRUST DATED APRIL 3, 2008; JAMIE LEE MEULMESTER, an individual; MICAH DANIEL MEULMESTER, an individual; CARRIE MARIE NAVARRO, an individual; JAMES PATRICK NAVARRO, an individual; MELISSA NORWOOD, an individual; ALANNA NOELLE NORWOOD, an individual; KIMBERLY NUNEZ, an individual; CHRISTIAN EDWARD PIRIJANIAN, an individual; EDWARD PIRIJANIAN, an individual; ANGEL PIRIJANIAN, an individual; JANETTE M. REID, individually and as Trustee of the JANETTE M. REID LIVING TRUST; SERENA MARIE REID, an individual; REINA TRIANA, an individual; LISA ANN LOPEZ SOARES, an individual; CLINTON CHARLES SPARKS, an individual; ANTHONY TIRADO, an individual; BREEANA CRISTINE TIRADO, an individual; PATRICIA ANN GONZALEZ, an individual; TERRY TOVAR, an individual; YASMIN GUADALUPE SOLIS, an individual; EDDIE TSUANG, an individual; CHEYENNE TSUANG, an individual; RENEE WACHTER, an individual; MARK WESTFALL, an individual; DANIEL WALK, an individual; COURTNEY WALK, an individual; JEFFREY GORDON WALK and KATHLEEN WALK, as Trustees of the JEFF AND KATHLEEN WALK TRUST; AMBAR L. WEBER, an individual; DAVID JAMES WEBER, an individual; JACKIE WILLEN individually and as Trustees of THE WILLEN TRUST; ALEKSEY V. ZHARINOV, an individual; and JENNIFER LEE ZHARINOV an individual.

COMPLAINT FOR DAMAGES

1    Plaintiffs,

2    v.

3    CHIQUITA CANYON, LLC, a Delaware
     Limited Liability Company; CHIQUITA
4    CANYON, INC., a Delaware Corporation;
     WASTE CONNECTIONS US, INC., a
5    Delaware Corporation; WASTE
     CONNECTIONS, INC., a Canadian and Texas
6    Corporation; and DOES 1 through 50,
     inclusive,
7
     Defendants.
8

9

10

11

12    COME NOW PLAINTIFFS, MARIA MAGDALENA ALANIS, an individual;

13    ROBERTO ADOLFO ALANIS, an individual; AUSTREBERTO ALANIS, an individual;

14    JULIAN JOSE ALMARAZ, an individual; LAURA ANN ALMARAZ, an individual; BRIANA

15    MARIE ALMARAZ, an individual; ROB C. BAGGALEY, an individual; LORRAINE

16    BAGGALEY, an individual; KEVIN ROBINSON BARRETT, an individual; MICHELE

17    (MIKELE) DIRENZO, an individual; SAGE LYNN BORGESE, an individual; BRENT STEVEN

18    BORGESE, an individual; ANDERSON BOYCE, SR., an individual; ROSIE BOYCE, an

19    

20    individual; ANDERSON BOYCE, JR.; an individual; ALEJANDRO RIVERA CAMPOS SR., an

21    individual; ALEJANDRO RIVERA CAMPOS JR., an individual; IRMA CAMPOS, an

22    individual; RAMIRO CAPA, an individual; SUZANNE MARIE COLONNA individually and as

23    Trustee of THE SUZANNE M. COLONNA REVOCABLE TRUST DATED NOVEMBER 21,

24    2015; CHARLES DEAN VUKOVIC, an individual; BALENTE CARDENAS, an individual;

25    GRISELDA LOPEZ, an individual; KARINA CARDENAS, an individual; SANDRA

26    

27    CARDENAS, an individual; JIMMY JUAREZ, an individual; CAROLINA LOPEZ, an

28

---

4

individual; JASMIN CARRILLO, an individual; JUAN GONZALEZ, an individual; LAISA CARRILLO, an individual; ERIC R. VACA, an individual; MARICELA H. CARRILLO, an individual; PEDRO CASIQUE CARRILLO, an individual; PEDRO CASIQUE CARRILLO, SR., individually and as Trustees of THE CARRILLO'S FAMILY REVOCABLE LIVING TRUST DATED AUGUST 10, 2023; MEGHAN ELIZABETH CARTER, an individual; AUSTIN JAMES KOWALCZYK, an individual; JOHN PATRICK CARTER, an individual; JESSICA ROUSSEL CHAMBERS, an individual; ANDREW T. CHAMBERS, an individual; JULIE ANNE CHECKETTS, an individual; COREY ROBERT CHECKETTS, an individual; AIDEN JAMES CHECKETTS, an individual; LETICIA DIAZ, an individual; DANTE ENRIQUE CERVANTES, an individual; RAYE MARIE DIAZ and RAYMOND ANTHONY DIAZ, individually and as Trustees of THE RAYMOND AND RAYE DIAZ LIVING TRUST; DEVIN MATTHEW DIAZ, an individual; KYLAH ELAINE DIAZ, an individual; GEORGE JOSEPH DIGIOVANNI, an individual; GINGER PAT DIGIOVANNI, an individual; EDWARD ANTHONY ELIAS, an individual; JAQUELIN CARDENAS, an individual; LUCAS ALLEN FARBER, an individual; NICOLE MARIE ELIAS, an individual; MARY ANNE GARCIA and RICHARD ADAIR GARCIA, individually and as Trustees of THE RICHARD A. GARCIA AND MARY ANNE GARCIA DECLARATION OF TRUST DATED OCTOBER 22, 2002; CARRIE IRENE HANKS, an individual; STEVEN MICHAEL HANKS, an individual; CHERYL A. HANKS, an individual; CHRISTOPHER ROBERT HANKS, an individual; ERIKA ANN WEINHOLD, an individual; RICHARD W. HUMANIC, SR. and VICKI JEAN HUMANIC, individually and as Trustees of THE RICHARD W. HUMANIC, SR. AND VICKI J. HUMANIC FAMILY TRUST U/D/T DATED SEPTEMBER 8, 2021; ELIZABETH VENULDA JEFFORDS, an individual; PAUL EDWIN KREYENHAGEN, individually and as Trustee of the PAUL

KREYENHAGEN LIVING TRUST; LISA LYNN LANDY, an individual; RICHARD RYAN LANDY, an individual; MAX LEVY, an individual; JUSTIN MAURICE LOWENTHAL, an individual; AMANDA MARIE LOWENTHAL, an individual; PAUL J. LOWENTHAL, an individual; LISA JEAN LOWENTHAL, an individual; CHRISTINE HOFFMAN, an individual; ALEXANDREA RANAE MARIN, an individual; CHRISTIAN MARIN, an individual; KARINA MCAHREN, an individual; RYAN MCAHREN, an individual; DANIELLE NICOLE McCALL, an individual; JOYCE CLAUDEAN MELIUS, an individual; PAMELA BETH MELIUS, individually and as Trustee of THE PAMELA B. MELIUS REVOCABLE TRUST DATED APRIL 3, 2008; JAMIE LEE MEULMESTER, an individual; MICAH DANIEL MEULMESTER, an individual; CARRIE MARIE NAVARRO, an individual; JAMES PATRICK NAVARRO, an individual; MELISSA NORWOOD, an individual; ALANNA NOELLE NORWOOD, an individual; KIMBERLY NUNEZ, an individual; CHRISTIAN EDWARD PIRIJANIAN, an individual; EDWARD PIRIJANIAN, an individual; ANGEL PIRIJANIAN, an individual; JANETTE M. REID, individually and as Trustee of the JANETTE M. REID LIVING TRUST; SERENA MARIE REID, an individual; REINA TRIANA, an individual; LISA ANN LOPEZ SOARES, an individual; CLINTON CHARLES SPARKS, an individual; ANTHONY TIRADO, an individual; BREEANA CRISTINE TIRADO, an individual; PATRICIA ANN GONZALEZ, an individual; TERRY TOVAR, an individual; YASMIN GUADALUPE SOLIS, an individual; EDDIE TSUANG, an individual; CHEYENNE TSUANG, an individual; RENEE WACHTER, an individual; MARK WESTFALL, an individual; DANIEL WALK, an individual; COURTNEY WALK, an individual; JEFFREY GORDON WALK and KATHLEEN WALK, as Trustees of the JEFF AND KATHLEEN WALK TRUST; AMBAR L. WEBER, an individual; DAVID JAMES WEBER, an individual; JACKIE WILLEN individually and as Trustees of THE WILLEN

TRUST; ALEKSEY V. ZHARINOV, an individual; and JENNIFER LEE ZHARINOV an individual; ("Plaintiffs"), by and through undersigned counsel, and hereby submit this Complaint against Defendants CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; WASTE CONNECTIONS US, INC., a Delaware corporation; WASTE CONNECTIONS, INC., a Canadian and Texas corporation; and DOES 1 through 50, inclusive, and each of them ("Defendants"), and allege as follows:

## **INTRODUCTION**

1.      Defendants own and operate the Chiquita Canyon Landfill, located at 29201 Henry Mayo Drive, Castaic, California, 91384. ("Landfill").

2.      Defendants' failure to properly operate, maintain, manage, and monitor the Landfill created a catastrophic condition that resulted in releases of odiferous and hazardous emissions from the Landfill into the surrounding communities.

3.      As experienced landfill operators, Defendants knew or should have known of elevated temperatures and concerns with subsurface conditions at the Landfill since 2019. Defendants failed to address these concerns, and in May 2022, their inaction resulted in the continuing and significant subsurface oxidation reaction that has grown in both size and impact (the "Reaction").  The Reaction has caused extreme temperature increases, excessive leachate production, and a change in the composition of the gas emanating from the Landfill.  This has resulted in releases of noxious odors, toxic landfill gases, and hazardous air contaminants including, but not limited to, volatile organic compounds ("VOCs") including benzene, semi-volatile organic compounds ("SVOCs"), nonmethane organic compounds ("NMOC"), methane, and sulfides, including hydrogen sulfide ("$H_2S$") and dimethyl sulfide ("DMS"), which have invaded, continue to invade and harmed, and continue to harm Plaintiffs' properties, property rights and health with no discernable endpoint.

////

COMPLAINT FOR DAMAGES

**Figure 1: Chiquita Landfill[1]**



4.      Not only did Defendants fail to detect and mitigate the underlying issues that resulted in the Reaction, but subsequent to causing the Reaction, they negligently managed the response, failing to stop the Reaction or abate its impact on the Plaintiffs.  Defendants' acts and omissions have created a severe and ongoing impact, causing harm to the Plaintiffs.

5.      Plaintiffs are individuals and legal entities who reside and/or own property in neighborhoods in the vicinity of the Landfill, whose lives and properties were harmed as a direct and proximate result of Defendants' negligent and reckless operation the Landfill.  Plaintiffs bring this action to recover compensatory damages for these harms.   Additionally, Plaintiffs seek

---

[1] Shutterstock.com Image from video Chiquita Canyon Landfill.  Drone aerial of trash trucks and bulldozers at landfill dumpsite. Stock Video ID: 3408264643 found at: https://www.shutterstock.com/video/clip-3408264643-chiquita-canyon-landfill-drone-aerial-trash-trucks (last access Dec. 17, 2024).

COMPLAINT FOR DAMAGES

punitive damages due to the reckless and wanton conduct of the Defendants.

## PARTIES

6.      At all relevant times hereto, Plaintiffs are individuals and other legal entities who were/are homeowners, renters, residents, occupants, and/or had property located in areas impacted by the release of hazardous chemicals and noxious fumes near the Landfill.

7.      Plaintiffs have all suffered damages, losses, and harm as a result of the Defendants' tortious and reckless actions.  These damages include but are not limited to the cost of remediating and/or mitigating the impacts of the Landfill's emissions on their properties, the loss of use of their properties in addition to the loss of use and comfortable enjoyment of their properties, the loss in value and marketability of their properties, damages based on annoyance, interference, inconvenience and discomfort, and other economic damages.  Additionally, individual Plaintiffs' constant exposure to noxious odors, toxic landfill gases, and hazardous air contaminants released from the Landfill has caused Plaintiffs to experience physical discomfort and injuries as well as emotional distress and mental anguish.  Plaintiffs seek damages to compensate them for these injuries.

8.      Plaintiffs have elected to join their individual lawsuits in a single action under rules of permissive joinder.  Plaintiffs do not seek class certification or relief on any class-wide, collective, or other group basis, but instead seek the damages and other remedies identified herein on an individual basis according to proof at trial.

9.      Defendant CHIQUITA CANYON, LLC ("CHIQUITA CANYON LLC") is a limited liability company organized under Delaware law, with a principal address at 3 Waterway Square Place, Suite 110, The Woodlands, Texas 77380, and is registered to do business as a foreign limited liability company in California.  On information and belief, CHIQUITA CANYON LLC had and continues to have a principal place of business located at 29201 Henry Mayo Drive in Castaic, California.

10.      Upon information and belief, the two members/managers of CHIQUITA CANYON LLC are Defendant CHIQUITA CANYON, INC. and Ronald J. Mittlestaedt.

11.      Defendant CHIQUITA CANYON, INC. ("CHIQUITA CANYON INC.") is a

COMPLAINT FOR DAMAGES

corporation incorporated under Delaware law, with a principal address at 3 Waterway Square Place, Suite 110, The Woodlands, Texas 77380, and is registered to do business as a foreign corporation in California.  On information and belief, CHIQUITA CANYON INC. had a principal place of business located at 2295 Iron Point Road, Suite 200 in Folsom, California 95630.  CHIQUITA CANYON INC. is a wholly owned subsidiary of Defendant WASTE CONNECTIONS US, INC.

12.     Defendant WASTE CONNECTIONS US, INC. ("WASTE CONNECTIONS US") is a corporation incorporated under Delaware law, with a principal address at 3 Waterway Square Place, Suite 110, The Woodlands, Texas 77380, and is registered to do business as a foreign corporation in California.  On information and belief, WASTE CONNECTIONS US, at all times relevant hereto, had its principal place of business located at 3510 Trenton Way, El Dorado Hills, California, 95762.  WASTE CONNECTIONS US is a wholly owned subsidiary of WASTE CONNECTIONS, INC.

13.     WASTE CONNECTIONS, INC. ("WASTE CONNECTIONS") is a publicly traded corporation, incorporated under the laws of Ontario, Canada, with a principal place of business in Woodlands, Texas.  Upon information and belief, WASTE CONNECTIONS was founded in Folsom, California in 1997.

14.     WASTE CONNECTIONS is the Owner and Operator of the Landfill and held itself out as the Owner and Operator of the Landfill.  Upon information and belief, at all times relevant hereto, WASTE CONNECTIONS exercised operational control over CHIQUITA CANYON LLC and the day-to-day activities at the Landfill, including but not limited to appealing agency decisions, having representation at various hearings before state and local agencies, responding to agency demands, and attending regulatory inspections of the Landfill.

15.     Defendants CHIQUITA CANYON LLC, CHIQUITA CANYON INC., WASTE CONNECTIONS US INC., and WASTE CONNECTIONS are collectively referred to herein as "W-C DEFENDANTS."

16.     On information and belief, W-C DEFENDANTS operated and continue to operate the Landfill.  W-C DEFENDANTS' acts and omissions, as more particularly described below,

resulted in the release of noxious odors, toxic landfill gases, and hazardous air contaminants which harmed Plaintiffs' properties, property interests and health.  W-C DEFENDANTS participated, authorized, aided, and/or abetted the torts as alleged herein, conspiring with the other Defendants to cause harm to Plaintiffs.

17.    On information and belief, WASTE CONNECTIONS US, and WASTE CONNECTIONS exercised and continue to exercise significant control of Defendants CHIQUITA CANYON INC. and CHIQUITA CANYON LLC, including but not limited to the general managing of daily activities at the Landfill and ensuring statutory protocols are followed at the Landfill, and participated, authorized, aided, and/or abetted the torts as alleged herein, conspiring with the other Defendants to cause harm to Plaintiffs.

18.    The names of other Defendants and/or their involvement in the events giving rise to the claims alleged herein are unknown to Plaintiffs at this time.  Plaintiffs, therefore, sue such Defendants in this action by fictitious names, identified as DOES 1 through 50, inclusive. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of Defendants designated as DOES 1 through 50, inclusive, when their identities and/or involvement become known.

19.    Defendants are each jointly and severally liable to the Plaintiffs for the damages Plaintiffs sustained as a direct and proximate result of Defendants' conduct, as herein alleged. Plaintiffs are informed and believe and thereon allege that each of the Defendants were, at all pertinent times, the agents, servants, employees, officers, directors, joint venturers, and/or partners, parents, affiliates, subsidiaries, successor-in-interests, related entities, of each of the other Defendants, and are each liable for their own actions and inactions.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the PLAINTIFFS have suffered damages in excess of $75,000 as a result of W-C DEFENDANTS' conduct alleged herein and there is diversity of citizenship, as W-C DEFENDANTS are citizens of different states.

21.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein

occurred in the Central District of California and both W-C DEFENDANTS' and PLAINTIFFS' properties that are the subject of the action are situated in the Central District of California.

## FACTS APPLICABLE TO ALL COUNTS

22.    Plaintiffs are citizens and residents of the Castaic, Val Verde, Live Oak, Hasley Hills, Hillcrest Parkway, Hasley Canyon, and Stevenson Ranch communities, living in close proximity to the Landfill.

### The Landfill

23.    The Landfill is currently a 639-acre municipal solid waste Class III landfill with a design capacity greater than 2.5 million megagrams ("Mg") and 2.5 million ("$m^3$"), as well as a calculated NMOC emission rate equal to or greater than 50 Mg per year.

24.    The Landfill was first approved for waste disposal in 1967 and began accepting waste in 1972.

25.    On May 20, 1997, the Landfill was issued Conditional Use Permit ("CUP") 89-081(5), authorizing the expansion of the Landfill and permitting its operation until it reached a capacity of 23 million tons on or about November 24, 2019.

26.    In 2009, WASTE CONNECTIONS purchased the Landfill through CHIQUITA CANYON INC.  At that time, the Landfill's Solid Waste Information System ("SWIS") Permit No. 19-AA-052 was transferred from Republic Services to CHIQUITA CANYON INC.

27.    In or around 2011, Defendants started applying for permits to further expand and extend the life of the Landfill.  In 2016 the Landfill exceeded the 23 million tonnage limit allowed under CUP 89-081(5), but received a waiver to continue operating.  On July 25, 2017, CUP No. 2004-00042-(5) was granted, allowing the Landfill to expand by 149 acres to a total area of 400 acres and to operate for another 30 years.

### Waste Connections - "A Top Player in Solid Waste Services"

28.    WASTE CONNECTIONS has been in the waste management and disposal industry since at least 1997.  WASTE CONNECTIONS holds itself out as the "premier provider of solid waste collection, transfer, recycling and disposal services, along with recycling and resource recovery, in mostly exclusive and secondary markets across the US and Canada."

29.     WASTE CONNECTIONS owns and operates 56 municipal waste landfills ("MSW"), 14 non-municipal solid waste landfills, 11 exploration and production landfills, and 52 facilities with "gas recovery systems," including the Landfill.  Upon information and belief, the Landfill generated over six (6) million dollars in revenue, with WASTE CONNECTIONS US generating over two (2) billion dollars in sales, and WASTE CONNECTIONS reporting $8.02 billion in revenue, consisting mainly of fees charged to customers for collection, transfer, recycling, and disposal of non-hazardous solid waste.

30.     On information and belief, executives and employees of WASTE CONNECTIONS are active in various chapters of the State and National Solid Waste Associations of North America ("SWANA") and regularly attend landfill industry trainings and meetings.  In addition to SWANA, information, guidance, and trainings on landfill management, emerging landfill technologies, Landfill Gas Capture and Control systems ("GCCS") and leachate management, and Elevated Temperature Landfill ("ETLF") monitoring, preventions, and mitigation are widely available through numerous sources.

31.     Defendants work with several contractors and consultants to advise them on the proper operation, maintenance, and monitoring at the Landfill, such as SCS Engineers, who are experts in ETLFs.  SCS Engineers publishes free publicly available educational and training webinars on various landfill management topics, including ETLFs.

### Generated Landfill Gas

32.     Landfill gas ("LFG") is a byproduct of the biological anerobic decomposition of organic materials and is chiefly composed of $CH_4$ (methane) and $CO_2$ (carbon dioxide).  LFG can contain toxic or carcinogenic compounds, such as benzene, butanethiols, $H_2S$ (hydrogen sulfide), toluene, and methanol.  Trace compounds (particularly mercaptans) contribute to landfill odors and are known constituents commonly found in smog or as reactants in smog formation.  LFG is also a fire hazard because of the methane production.

33.     By the late 1960's literature references related to gas generation and migration, both within and around landfills sites, began to increase rapidly.  Various field investigations were undertaken, examining factors influencing gas production from a variety of organically based

waste materials, resulting in an increase in the general knowledge of gas production and migration potential at landfills. During the late 1970s and early 1980s, there was an increasing number of published articles, papers, and reports referring to case histories of gas migration problems, many of which provided actual or conceptual design criteria for controlling LFG movement beyond site boundaries.

34.     For example, in December 1994, the US EPA started the Landfill Methane Outreach Program, and by March 1996 started requiring landfills that hold 2.5 million Mg of waste or more to install Landfill Gas Capture and Control Systems ("GCCS") or prove that the landfill emits less than 50 Mg per year of NMOCs.

35.     In April 2008, CalRecycle publicly released "Technologies and Management Operations for Reducing Greenhouse Gas Emissions from Landfills" to provide landfill operators and regulators with recommended technologies and Best Management Practices ("BMPs") to reduce LFG emissions through improved landfill design, construction, operation, and closure.

36.     On June 22, 2011, the US EPA publicly released "Guidance Document on LFG Control Methods."

37.     In April 2013 the US Army Corps of Engineers ("USACE") publicly released their "Landfill Gas Collection and Treatment Systems Engineering Manual," offering guidance related to the design, operation, and maintenance of LFG collection and control systems.

38.     In 2016 the US EPA Office of Air and Radiation ("OAR") published a series of LFG overviews and factsheets for the landfill industry.

39.     In August 2018 CalRecycle publicly released "Best Management Practices for Landfill Gas Monitoring Well/Probe Construction," providing guidance to landfill operators, consultants, and local enforcement agencies regarding effective design and construction of LFG monitoring wells/probes.

40.     In addition, SWANA's Landfill Gas & Biogas Division ("LGB") is widely recognized as a leading authority on issues surrounding LFG recovery, control, management, utilization, system design, operation, and maintenance, offering numerous publications on LFG.

41.     Since the beginning of the LFG-to-energy ("LFGTE") industry in the late 1960s to

early 1970s, the vertical extraction well has been the most commonly used LFG collection device.

42.    Since approximately 2010, Ameresco Chiquita Energy, LLC ("Ameresco") operated a landfill gas-to-renewable natural gas production facility at the Landfill, converting LFG into pipeline-quality renewable natural gas.  Ameresco, however, does not control chemical concentrations in the LFG delivered from the Landfill.

43.    In January 2023, Ameresco shut down its LFGTE plant due to high sulfur in the LFG coming from the Landfill, due to the negligent operation of the Landfill by Defendants.

44.    Landfills often install GCCS with operational goals of complying with federal, state and local regulations, preventing LFG migration and controlling odors.

45.    Upon information and belief, the Landfill's GCCS include vertical and horizontal gas collection wells and associated piping and trenches, collection headers and blowers for venting landfill gas, a landfill gas treatment system, a condensate/leachate collection system, and two flares that will combust landfill gas that contains hazardous chemicals.

46.    California Code of Regulations, Title 27 ("27 CCR"), Division 2, Subdivision 1, Chapter 3, Subchapter 4, Article 6, Sections 20917 *et seq*., requires monitoring of LFG to determine if LFG is migrating beyond the permitted facility boundary.

47.    However, as more specifically outlined below, Defendants failed to properly monitor and manage the GCCS, to the detriment of neighboring communities.

48.    Upon information and belief, Defendants were active in landfill industry associations, hired professional landfill engineering consultants, and were informed on the dangers and hazardous of LFG, necessitating the proper maintenance and monitoring of GCCS. Defendants had a duty to ensure the proper maintenance and monitoring of the GCCS at the Landfill.  Defendants knew or should have known that the Landfill's LFG had the potential to migrate off-site, is often odiferous, and is potentially hazardous to neighboring properties.

49.    Defendants knew or should have known that the adoption of high standards for landfill management and site practices involves proper control of generated LFG to limit the detrimental effects of hazardous and/or obnoxious gases and control the migration of these contaminants to neighboring properties.

50.     Notwithstanding this knowledge, Defendants failed to properly monitor and maintain the GCCS at the Landfill and failed to prevent the off-site migration of LFG, which resulted in continuing harm to the Plaintiffs.

**Defendants' Permit Violations and Mismanagement of the Landfill Prior to the Reaction**

51.     Prior to the Reaction, Defendants have received numerous Notices of Violations ("NOV") for their failure to operate the Landfill in compliance with regulatory requirements of their various permits, including the Landfill's Title V Operating Permit ("Title V Permit") and the CUP.

52.     In July of 2011, CHIQUITA CANYON INC. began applying for permits to expand the Landfill.

53.     On November 19, 2015, CHIQUITA CANYON INC. requested a temporary waiver to permit the Landfill to exceed the 23-million-ton limit during the pendency of the application to avoid a temporary closure of the Landfill.

54.     On or about July 25, 2017, the Landfill was issued CUP 2004-0042-(5), with CHIQUITA CANYON LLC, identified as owner and operator.

55.     Although the CUP permitted the expansion and continued operations of the Landfill, this authorization was subject to 130 detailed conditions of approval, including Section 63, under which the Permittee must ensure the Landfill does not create a nuisance in the surrounding communities, and must adopt and implement operational practices to mitigate air quality impacts including, but not limited to, odor, dust, and vehicular air quality impacts as required by the California's South Coast Air Quality Management District ("South Coast AQMD"), and Sections 65 and 68, which require the Permittee to conduct air and Landfill gas monitoring that meets certain specifications.

56.     On November 14, 2017, South Coast AQMD issued a Title V Air Operating Permit to CHIQUITA CANYON LLC for the Landfill.  Under the CAA National Emission Standards for Hazardous Air Pollutants ("NESHAP") and New Source Performance Standards ("NSPS") conditions of the Title V Permit, the Landfill is required to operate and maintain both GCCS and leachate capture and control systems.

57.     On or about December 11, 2017, only six months after receiving the CUP, the Landfill was issued a NOV for accepting treated auto-shredder materials in violation of the CUP.

58.     On or about December 18, 2018, South Coast AQMD issued the Landfill a NOV for failure to operate the equipment at the facility in compliance with all terms, requirements, and conditions specified in the Title V Permit, including the improper operation of the flare intended to combust LFG.

59.     On December 20, 2018, the Los Angeles Regional Control Board issued Order No. R4-2018-0172, which included specific Waste Discharge Requirements that Defendants, as Landfill's operators were required follow.  The Order expressly prohibited "[o]dors, vectors, and other nuisances originating from waste that migrate beyond the limits of the Landfill" and further provided that Defendants were required to conduct site operations such that no constituent of concern (COC) shall exhibit a measurably significant increase over its respective concentration limit (background data set) at any well.

60.     In May 2019, CalRecycle issued the Landfill a Notice of Failure to Comply with the Recycling and Disposal Reporting System regulations, requiring a Remediation Plan for Methane exceedances in violation of the CUP.

61.     On or about September 4, 6, and 7, 2019, South Coast AQMD issued the Landfill NOVs for discharging such quantities of air contaminants as to cause injury, detriment, nuisance, or annoyance to a considerable number of persons, in violation of South Coast AQMD Rule 402 and California Health and Safety Code Section 41700.

62.     On or about November 15, 2019, CalRecycle issued the Landfill a "Notice of Intent to include Chiquita Canyon Sanitary Landfill on the Inventory of Solid Waste Facilities Which Violate State Minimum Standards" for repeat violations of Title 27, California Code of Regulations, Section 20921 - Gas Monitoring and Control.

63.     On or about June 11, 2020, the Landfill was issued a NOV by the Los Angeles County Department of Regional Planning, for, among other things, failing to conduct air quality monitoring as required by Condition 68 of the CUP, noting that the Landfill has failed to make any progress toward complying with this condition.  The NOV also found that despite the CUP

being issued nearly three years prior, the Landfill had still not designed a Community Air Monitoring ("CAM") program that ensures that the air quality monitoring is conducted in an effective manner.

64.    In 2020, the Landfill was issued eighteen (18) NOVs by South Coast AQMD for discharging such quantities of air contaminants to cause injury, detriment, nuisance, or annoyance to a considerable number of persons, in violation of Rule 402 and California Health and Safety Code Section 41700.

65.    Condition No. 69 of the CUP required that the Landfill submit a NOV summary report to the Los Angeles County Department of Public Works ("DPW") upon receiving four NOVs related to air quality within a calendar year.  On August 21, 2020, Defendants submitted a NOV summary report regarding the eight NOVs issued to the Landfill by the South Coast AQMD in the previous 30 days.  On September 21, 2020, Defendants submitted another report to the DPW explaining nine additional NOVs issued to the Landfill by South Coast AQMD.

66.    On December 16, 2020, South Coast AQMD Hearing Board issued a Stipulated Order for Abatement ("SOFA") to the Landfill, requiring Defendants to provide monthly odor surveillance logs, tarp cover inspection logs, intermediate inspection logs, and LFG collection system reports.

67.    On May 5, 2021, South Coast AQMD issued the Landfill yet another NOV for improper discharge of air contaminants, causing injury, detriment, nuisance, or annoyance to a considerable number of persons, in violation of Rule 402 and California Health and Safety Code Section 41700.

68.    Defendants, as experienced landfill operators, knew or should have known by 2019 that conditions at the Landfill were concerning.  However, instead of utilizing best available technology to determine the source of the odors for which they were repeatedly cited, addressing the known problematic surface and subsurface conditions at the Landfill, and otherwise adhering to industry standards, Defendants continued to operate the Landfill ignoring the problems, focusing instead on profits and revenue.  This reckless derogation of duties ultimately led to the Reaction, which to date continues to harm the Plaintiffs.

**Defendants' Knowledge of Elevated Temperature Landfill Conditions Prior to the Reaction**

69.    Defendants knew that the Landfill exhibited Elevated Temperature Landfill Conditions ("ETLF") since 2019.

70.    Generation of heat in a municipal solid waste ("MSW") landfill is normal as microorganisms break down waste.  ETLFs are MSW landfills that exhibit temperatures <u>above</u> regulatory thresholds (131 or 145-degrees Fahrenheit ["°F"]) due to known chemical reactions within the waste mass.  These reactions can cause changes in LFG composition, noxious odors, rapid and severe waste settlement, and increased generation of leachate, along with leachate seeps and outbreaks.

71.    Defendants are required under their Title V Permit to record and monitor temperatures within their LFG extraction wells.  Defendants knew or should have known that the main function for enhanced monitoring is to monitor, detect, prevent, and mitigate subsurface conditions that may lead to ETLF conditions, as to avoid the creation of increased emissions, odors, and leachate that are known to contain high levels of VOCs, including benzene.

72.    The "tell-tale" signs of ETLF conditions are well known throughout the landfill industry.  Elevated gas temperatures (>131°F), decreased amounts of methane ($CH_4$ <40%), increased concentrations of $CO_2$ (>50%), and increased CO, hydrogen ($H_2$), and ammonia ($NH_3$) gases are all indications of ETLF conditions.

73.    Based on the data that Defendants submitted pursuant to their Title V Permit's enhanced monitoring requirements, as illustrated by Figures 2 and 3 below, Defendants knew or should have known that the LFG temperature was rising above the point of concern in 2019.

**Figure 2: Gas Wells With Temperatures Above 131 degrees by Date.**



**Figure 3: Gas Wells with Temperatures Above 131 degrees Per Year.**



74. LFG temperatures between 131-145°F indicate heat-generating chemical reactions are occurring; LFG temperatures above 145°F indicate that $CH_4$ (Methane) generation has slowed; and LFG temperatures above 162°F indicate that biological activity is occurring.

75. Defendants knew or should have known the temperature data showed dire subsurface conditions, one which required immediate mitigation measures and corrective actions to avoid the well-known consequences of ETLF conditions.

76. Defendants knew or should have known the other indicators of ETLF conditions, that the Landfill was exhibiting, such as low to no oxygen ("$O_2$") levels, changes in methanogenic microbial activity, and moisture content within monitored subsurface conditions, all require immediate corrective action.  Defendants' industry associations, governmental agencies, and consultants have published guidance and research that detail the actions necessary when such conditions are present.

77. Defendants knew or should have known, (as described by their consultant, SCS Engineering), that ETLF conditions create "a warzone" … which requires a "battle plan" and proper "crisis management."  Defendants failed to mitigate the subsurface conditions and stop the Landfill from becoming a "warzone" that harmed the Plaintiffs and Plaintiffs' properties.

78. Notwithstanding their early awareness of ETLF conditions, and knowledge of the consequences of these conditions, Defendants acted with a willful, conscious, and reckless disregard towards Plaintiffs by failing to properly address these conditions.

**The Reaction**

79.     Defendants' failures to address the conditions at the Landfill, as outlined above, culminated in the catastrophic event giving rise to this Complaint.

80.     Since approximately May 2022, the Landfill has been experiencing a significant subsurface oxidation event that has grown in size and impact ("Reaction").  An oxidation event is a subsurface reaction at a landfill that occurs when oxygen intrudes below the landfill cover and results in extreme temperature increases, excessive leachate production, and a change in the composition of the LFG.  During such reactions, while methane is decreased, the concentrations of $CO_2$, $H_2S$, and VOCs in the LFG are increased, and if not properly managed, will be released into the atmosphere surrounding the Landfill.

81.     The ongoing Reaction has caused, and continues to cause, increased temperatures, increased production of LFG, and increased production of leachate, as well as fugitive emissions of LFG from the surface of and GCCS at the Landfill.

82.     The Reaction will likely continue underground for years and there is no predicted containment point.  The improper emissions from the Landfill have been pervasive and persistent, such that the emissions have been causing, and will continue to cause, excessive, unreasonable, and intentional harm to Plaintiffs' properties and persons, with the harm continuing into the foreseeable future.

83.     Defendants knew or should have known that the ETLF conditions at the Landfill would develop into the Reaction.  Defendants were aware of the increased LFG temperatures and excessive leachate production as early as 2019, well before acknowledging the Reaction in May 2022, when they could no longer conceal the noxious odors, toxic emissions, leachate production rates, and leachate seeps and geysers from regulatory agencies or the communities surrounding the Landfill.

84.     Plaintiffs were unaware that the noxious odors were coming from the Landfill until Defendants began to officially acknowledge the Reaction in early 2023.

85.     The Landfill's Semi-Annual NSPS and NESHAP Reports for 2022 and the first half of 2023, show that Defendants consistently failed to properly monitor and implement

corrective actions, which led to the enlarged size and impact of the Reaction, the increased leachate production, and the noxious odors and hazardous emissions infiltrating the surrounding communities. There were: (i) a total of 86 GCCS wells with downtime exceeding 30 days and for less than or equal to 124 days; (ii) eight GCCS wells with downtime exceeding 30 days and that downtime is ongoing; (iii) 39 wells where the wellhead temperature above 145°F was not corrected within 60 days of the initial measurement; (iv) at least five GCCS wells with temperature measurements above 145°F for which the Landfill did not submit a root cause analysis, corrective action analysis, and corresponding implementation timeline; (v) 27 GCCS wells where the wellhead temperature was above 170°F and the carbon monoxide concentration measured was greater than or equal to 1,000 parts per million volume ("ppmv") and corrective actions to return the wells below 145°F were not completed within 15 days; and (vi) 10 GCCS wells where the wellhead temperature was above 170°F and the carbon monoxide concentration measured was greater than or equal to 1,000 ppmv and corrective actions to return the wells below 145°F had not been completed within 15 days.

86.    The Landfill performed enhanced monitoring less frequently than the required weekly monitoring 18 times in 2022, totaling 174 days in which weekly monitoring was late; and 222 times in 2023, totaling 124 days in which weekly monitoring was untimely. Enhanced monitoring was not conducted at six wells with measured temperatures above 145°F in 2023, and annual down well monitoring was not conducted at two wells in 2023.

87.    Defendants' failure to control conditions at the Landfill has enabled the expansion of the Reaction area to approximately 30 to 35 acres in size. The ongoing subsurface Reaction and the failure of the GCCS to operate effectively has resulted in an increase in noxious odors and hazardous air contaminants released from the Landfill. The Reaction has caused leachate production at the Landfill to increase from approximately 150,000 gallons per week in January 2022 to over 1,000,000 gallons per week in December 2023, resulting in an increased release of fugitive hazardous air contaminants and noxious odors from the Landfill that have invaded, and continue to invade surrounding communities.

88.    From January to April 2023, South Coast AQMD started receiving a dramatic

increase in odor complaints that inspectors traced back to the Landfill.

89.    In 2023, South Coast AQMD received almost 6,800 complaints of odors from the public, particularly members of the public located in the surrounding communities of Val Verde, Hasley Canyon, Hillcrest, Williams Ranch, North Bluffs, Hasley Hills, and Live Oak.  South Coast AQMD has confirmed the Landfill as the source of the noxious odors, and to date continues to receive odor complaints from owners and occupants of properties surrounding the Landfill.

**Figure 4: Odor Complaints Per Day**



90.    These complaints document that persons residing at properties near the Landfill have suffered impacts due to the noxious odors, toxic landfill gases, and hazardous air contaminants being released from the Landfill, including, but not limited to, reports of eye irritation, nosebleeds, nausea, migraines, and respiratory symptoms.  Various members of the public reported that they are unable to have their children play outside in the yard, walk their pets, or exercise outdoors due to odors from the Landfill.  Noxious odors were reported by concerned parents, teachers, staff, and students at schools as near as 1.7 miles from the Landfill, and as far as 5.0 miles from the Landfill, including at HeadStart Preschool in Val Verde, Playmakers Preschool in Castaic, Santa Clarita Valley International Elementary School in Castaic, Live Oak Elementary School in Castaic, Castaic Elementary School in Castaic, Castaic High School in Castaic, Rio Vista Elementary School in Canyon Country, West Ranch High School in Stevenson Ranch, and Valencia High School in Valencia.

91.     On or about July 26, 2023, Defendants received a notice from the Los Angeles Department of Public Health stating, "Public Health has received complaints from nearby residents regarding noxious, sometimes chemical-like odors" emanating from the Landfill that make them "nauseous, produce vomiting, and gives them eye and throat irritation and headaches," noting that odors currently being emitted from the Landfill into the surrounding neighborhoods of "Val Verde, Live Oak, and Hasley Canyon are both pervasive and lengthy in duration," and finding that this situation met the definition of a public nuisance under Civil Code Section 3479 and Section 11.02.190 of the Los Angeles County Code.

92.     The surrounding communities demanded action on the part of Defendants to address the ongoing releases of noxious odors, toxic landfill gases, and hazardous air contaminants.  However, rather than taking accountability for their inaction, failure to properly address the Reaction, and mitigate the Reaction's effects, Defendants blamed the problem on "previous operators" and described temporary fixes.

93.     On or about September 6, 2023, the South Coast AQMD Hearing Board held a hearing on the request to revoke Landfill's CUP permit variance and to issue an order of abatement, which included proposed findings containing 40 separate "conditions and increments of progress" to mitigate the ongoing nuisance created by the Landfill.  The Hearing Board issued a Stipulated Abatement Order requiring the Landfill to investigate and mitigate the odors and expansion of the Reaction.

94.     On October 16, 2023, CalRecycle issued a report finding that over the prior 18 months the Landfill had experienced, among other things, a heating/smoldering event that was expanding in size and intensity, unusual landfill settlement, LFG temperatures over 170°F, subsurface temperatures over 195°F, and elevated carbon monoxide concentrations above 1000 ppmv.  CalRecycle further concluded that the conditions at the Landfill were causing additional gas pressure, noxious odors, elevated well and leachate temperatures, and damage to the gas extraction system at the Landfill.  The report further noted that the LFG generated in and around the Reaction area exceeded the designed gas generation flow rate and caused increased emissions and noxious odors.

95.     Since 2023, South Coast AQMD has issued approximately 222 NOVs citing a public nuisance caused by the odors under South Coast AQMD's Rule 402 and the California Health and Safety Code Section 41700.

96.     Despite the rising concerns and the increases in noxious odors, toxic landfill gases, and hazardous air contaminants emanating from the Landfill, on or about October 26, 2023, at the WASTE CONNECTIONS earnings call, Defendants noted that there are currently no impacts to ongoing waste acceptance" at the Landfill, thereby continuing to prioritize, profits over safety and compliance with the legal and regulatory framework required for landfill operators.

97.     On or about May 15, 2024, CalRecycle issued a notice to the Landfill that it would be included, once again, on the Inventory of Solid Waste Facilities Which Violate State Minimum Standards, specifically CCR 27, Section 20921 – Gas Monitoring and Control and Section 20750 – Site Maintenance.

98.     On or about June 4, 2024, the US EPA issued a Finding of Violation to the Landfill under the Clean Air Act. (CAA).  The US EPA found that Landfill has, and continues to: (i) violate the Standards of Performance for New Stationary Sources, General Provisions at 40 C.F.R. Part 60, Subpart A ("NSPS General Provisions"); (ii) the Standards of Performance for Municipal Solid Waste Landfills That Commenced Construction, Reconstruction, or Modification After July 17, 2014, at 40 C.F.R. Part 60, Subpart XXX ("NSPS Subpart XXX"); (iii) the National Emission Standards for Hazardous Air Pollutant Source Categories, General Provisions at 40 C.F.R. Part 63, Subpart A ("NESHAP General Provisions"); (iv) the National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills at 40 C.F.R. Part 63, Subpart AAAA ("Landfill NESHAP"); and/or (v) the Title V Permit, issued for the Landfill.

99.     South Coast AQMD's review of the Landfill CAM data showed approximately 35% of all hydrogen sulfide readings over the past 12 months exceeded the State standard of 30 parts per billion ("ppb"), averaged over one hour.   Some readings, across a 1-hour average, exceeded 300 ppb, ten times the OEHHA standard.  The highest single reading exceeded 500 ppb. SCAQMD Monitoring and Analysis staff concluded from this data review that there was clear indication that air emissions from CCL were having significant impact to the community.

100.     Numerous chemical analytes, including VOCs, SVOC, and sulfides have been detected throughout the communities surrounding the Landfill.  This sampling and monitoring confirms that toxic landfill gases, and hazardous air contaminants from the Landfill, including, but not limited to, VOCs including benzene, SVOCs, NMOCs, methane, and sulfides, including $H_2S$ and DMS, along with dust, have physically intruded onto and into Plaintiffs' properties, and continue to do so, damaging Plaintiffs' health, properties and property rights.

101.     On August 17, 2024, South Coast AQMD held a public hearing on Defendants' response to the ongoing concerns, noting that in the 11 months since the Abatement Order was issued, there have been no meaningful improvements to the odors.  South Coast AQMD explained that the geographic range of odor complaints has actually increased, and that Defendants are "well behind schedule" on the promised odor mitigation schedule, including failing to complete the Geosyntetic Cover and to implement LFG wells at a sufficient depth.

102.     Notwithstanding the fact that the Landfill is operating under crisis-like conditions due to Defendants' acts and omissions before and after the Reaction, Defendants continue to oppose reasonable measures proposed by South Coast AQMD to mitigate the odors, including limiting trash accepted at high wind hours, again, putting profits above all.

**Increased Leachate Production and Storage of Hazardous Waste at the Landfill**

103.     Defendants' mishandling of the increased leachate production caused by the Reaction, as outlined below, further underlines the reckless manner in which Defendants have continued to mismanage the ongoing conditions at the Landfill, as well as their disregard for the welfare of the surrounding communities.

104.     On or about November 22, 2023, the Los Angeles Region California Regional Water Quality Control Board ("RWQCB") issued a NOV to the Landfill for failing to maintain adequate leachate containment and failing to report the leachate seeps occurring at the Landfill.

105.     In or around November 2023, the Los Angeles County DPH Solid Waste Management Program issued the Landfill a NOV for non-compliance with leachate control requirements, ordering the Landfill to address the ongoing and uncontrolled thermal reaction producing increasing amounts of leachate, and to assure that the drainage installed at the Landfill

1  would not fail.  In addition, the NOV required the Landfill to test the leachate for benzene and

2  other VOCs.

3      106.    Also on November 2023, South Coast AQMD cited the Landfill for failure to

4  maintain the leachate collection and storage system in good operating condition, failure to report

5  the breakdown of equipment, failure to submit a landfill excavation plan, and several other permit

6  violations.  South Coast AQMD observed leachate on numerous occasions bubbling, boiling, or

7  shooting out like a geyser, and noted that the pooled and flowing liquid is seeping out of the soil

8  and is causing additional foul-smelling odors.

**Figure 5: Photo of a Leachate Geyser** [2]



20      107.    On December 12, 2023, California DTSC collected samples from GCCS well-

21  heads located in the reaction area of the Landfill.  DTSC found benzene in exceedance of the

22  Toxicity Characteristic Leaching Procedure ("TCLP") threshold of 0.5 milligrams per liter

23  ("mg/L") in violation of the Hazardous Waste Control Law.  DTSC also found that the samples

24  exhibit flash points in the potentially ignitable range.

---

[2] The Signal Santa Clarita Valley State Agency: Chiquita violates toxic waste law: Supervising AQMD Inspector Larry Israel shares a photo of a leachate geyser that occurred while he was inspecting Chiquita Canyon with an EPA official.  Courtesy photo: https://signalscv.com/2024/02/state-agency-chiquita-violates-toxic-waste-law/ (last accessed Dec. 17, 2024.)

108.    On February 7, 2024, Roux Associates, Inc. issued a report stating that on certain days, benzene concentrations measured in the community air appeared to be greater, and this likely represents a contribution of benzene resulting from the Landfill's emissions.   The report recommended that the Landfill increase its benzene sampling frequency and lower its benzene reporting limit in order to better assess potential benzene emissions from the Landfill, recommendations to which Defendants failed to adhere.

109.    On February 14, 2024, Defendants requested that DTSC approve an immediate response exemption claiming that under California hazardous waste regulations, a permit (and thus compliance with the substantive standards for permitted facilities) is "not required for treatment or containment activities which are necessary to perform an immediate response to … an imminent and substantial threat of a discharge of hazardous waste." Defendants further claimed that because of the conditions, including the "extremely large volumes of leachate and condensate being generated (approximately 200,000 gallons or 4,000 drum's worth per day)," compliance with the regulatory framework was not a viable option.

110.    In short, Defendants requested to store and treat hazardous waste that is generated in amounts that they cannot control, without proper permitting, monitoring, storage, and containment because of the emergency conditions that Defendants themselves have created.

111.    On February 15, 2024, the California DTSC issued a NOV to the Landfill for shipping hazardous leachate to facilities not authorized to accept hazardous waste and for its repeated failures to manage the leachate produced by the Landfill, which at times contained hazardous levels of benzene and/or other hazardous substances.

112.    On February 16, 2024, DTSC issued the Landfill a Proposition 65 warning under California Health and Safety Code section 25180.7, for the "threatened illegal discharge" of hazardous waste.   DTSC issued a Summary of Violations related to the Landfill's leachate management and disposal, including violations for failing to properly categorize the waste, causing the storage and disposal of hazardous waste at an unauthorized point, and failing to minimize the possibility of release of hazardous waste.  DTSC concluded that there is reason to believe that the threatened illegal discharge is likely to cause substantial injury, and result in the contamination of

1   neighboring properties.

2       113.   On February 21, 2024, US EPA issued a Unilateral Administrative Order regarding

3   violations at the Landfill.  The EPA concluded that the conditions at the Landfill violated several

4   laws and regulations and posed an imminent and substantial endangerment to public health and

5   welfare or the environment, including, but not limited to leachate and/or leachate condensate

6   emanating from the Landfill near or above the Reaction Area, which contains hazardous materials

7   including, but not limited to, benzene, and therefore is a "hazardous waste" as defined in Section

8   1004(5) of RCRA, 42 U.S.C. § 6903(5).  The US EPA found that Defendants contributed and are

9   contributing to the handling, storage, treatment, and disposal of solid and hazardous wastes, which

10   is resulting in increased air emissions and leachate waste streams causing an impact to properties

11   surrounding the Landfill.  The US EPA found that there are "several potential pathways for

12   individuals on and off-site to be exposed to hazardous substances, including, but not limited to,

13   the migration of air emissions [and] potential contamination of the groundwater."

14       114.   In March 2024, a citizens' group sent videos to the California EPA ("CalEPA") of

15   a pump releasing "untreated water into the Santa Clara River."  A second complaint was sent

16   stating that the Landfill has been discharging leachate ponds into the local waterway.

17       115.   On March 28, 2024, RWQCB issued a NOV to the Landfill for, among other things,

18   stormwater permit and plan violations and deficiencies, failing to control leachate seepage, and

19   permitting landfill leachate to comingle with stormwater runoff and discharge into the Santa Clara

20   River.

21       116.   On April 9, 2024, RWQCB issued a NOV to the Landfill for intentionally and

22   illegally dumping water containing unknown substances into the Santa Clara River.

23       117.   Defendants exacerbated and prolonged the Reaction by failing to manage the

24   increased leachate created by the Reaction.  The increased production and improper management

25   of leachate significantly contributed, and continues to contribute, to the releases of noxious odors,

26   toxic landfill gases, and hazardous air contaminants that have invaded, and continue to invade, the

27   properties of Plaintiffs, and harmed, and continue to harm, Plaintiffs' property rights and health.

28   Additionally, Plaintiffs are forced to reside next to a facility that treats and stores hazardous waste

1    without having to follow the proper permitting, monitoring, storage, and containment regulations.

2    **Increased Risk of Health Effects from Landfill Emissions**

3    118.    As the result of the Defendants' actions and inactions, Plaintiffs have been exposed

4    to noxious odors, toxic landfill gases, and hazardous air contaminants from the Landfill, including,

5    but not limited to, VOCs including benzene, SVOCs, NMOCs, methane, and sulfides, including

6    $H_2S$ and DMS.

7    119.    VOCs are a group of chemicals that have a high vapor pressure, low water

8    solubility, and are emitted as gases from solids or liquid furnishings.  The health effects of VOCs

9    can vary depending on the specific compound, level, and duration of exposure.  With short-term

10   (acute) exposure, VOCs can cause irritation of the eyes, nose, and throat, headaches and dizziness,

11   and exacerbate asthma symptoms.  High VOC concentrations can cause difficulty breathing,

12   nausea, and vomiting.  Long-term (chronic) exposure to VOCs can cause chronic respiratory

13   conditions, decrease in lung function, loss of coordination and other neurological effects, and

14   ongoing headaches.  Some VOCs, such as benzene and formaldehyde, are known carcinogens and

15   can increase the risk of cancer with long-term exposure and adversely affect reproductive health

16   and fetal development.

17   120.    Benzene is a known environmental contaminant due to its presence in cigarette

18   smoke, gasoline, and industrial emissions.  Short-term (acute) exposure to benzene can affect the

19   central nervous system ("CNS") and lead to irritation of the eyes, skin, and throat, along with

20   nausea and vomiting.  Short-term inhalation of high levels of benzene can result in serious CNS

21   effects, including confusion, tremors, and unconsciousness.  Long-term (chronic) exposure comes

22   with severe health ramifications, including hematological effects such as aplastic anemia, a

23   condition where bone marrow fails to produce enough blood cells, resulting in fatigue, weakness,

24   and increased susceptibility to infections and bleeding.  Moreover, benzene is classified as a Group

25   1 carcinogen by the International Agency for Research on Cancer ("IARC"), indicating

26   carcinogenicity in humans.  Prolonged exposure to benzene is associated with an increased risk of

27   various types of cancer, including leukemia and lymphoma.  In addition, chronic exposure to

28   benzene can result in reproductive and developmental harm, including menstrual irregularities and

1    decreased fertility in women, as well as developmental toxicity in fetuses.

2        121.    SVOCs are a subgroup of VOCs that have a higher molecular weight and boiling

3    point.  Due to their semi-volatile nature, they can adhere to surfaces and dust, leading to prolonged

4    exposure in the environment.  The potential health effects for acute exposure include irritation,

5    asthma symptoms, shortness of breath, headaches, and nausea.  Chronic exposure may lead to

6    decreased lung function.  Certain SVOCs, such as polycyclic aromatic hydrocarbons ("PAHs"),

7    are known to be carcinogenic, with exposure increasing the risk of cancer.  For example,

8    Polychlorinated Biphenyls ("PCBs") were found to be associated with cancer and liver damage.

9    Long-term exposure to SVOCs may cause other health effects, such as: (i) memory loss, reduced

10   motor function, and cognitive deficits; (ii) mood disturbances, including depression and anxiety;

11   (iii) hormonal balance and reproductive health issues; and (iv) learning and behavioral problems

12   in children.

13       122.    Methane ($CH_4$) is a colorless, odorless, and highly flammable gas that is a major

14   component of natural gas.  It is produced both naturally and through human activities, such as the

15   decay of organic matter in landfills and the extraction and processing of fossil fuels.  The primary

16   health risks arise from its potential to cause asphyxiation, its role in creating explosive

17   environments, and its contribution to air pollution as a greenhouse gas.  In the short-term, methane

18   can cause fires and explosions, leading to burns, injuries, and fatalities, because it is highly

19   flammable and can form explosive mixtures with air.  Methane can displace oxygen in the air when

20   the concentration is high, leading to symptoms of asphyxiation, including rapid breathing,

21   shortness of breath, and in severe cases, loss of consciousness and suffocation.  Long-term

22   (chronic) exposure can exacerbate respiratory diseases such as asthma and reduce lung function.

23   Chronic exposure to elevated ozone levels can lead to respiratory problems, cardiovascular issues,

24   and premature death.  Additionally, methane is a potent greenhouse gas, its release into the

25   atmosphere contributes to climate change, which results in health impacts, including heat-related

26   illnesses and vector-borne diseases.

27       123.    Hydrogen sulfide ($H_2S$) is a colorless gas known for its characteristic odor of rotten

28   eggs.  It is a by-product of industrial activities such as petroleum refining, natural gas processing,

and wastewater treatment. Acute exposure to $H_2S$ can cause respiratory and neurological symptoms. Inhalation of low concentrations of $H_2S$ can cause irritation of the eyes, nose, and throat, while higher concentrations can cause coughing and shortness of breath. Even with short term exposure, $H_2S$ can cause symptoms such as fatigue, irritability, insomnia, headaches, dizziness, and nausea. High concentrations (greater than 500 parts per million ["ppm"]) can lead to rapid loss of consciousness, respiratory failure, and death. Long-term exposure to low levels of $H_2S$ can result in ongoing eye irritation and conjunctivitis, decreased lung function and increased susceptibility to respiratory infections, and chronic respiratory conditions such as bronchitis. Chronic exposure to $H_2S$ has been associated with neurological effects such as memory loss, reduced motor function, and cognitive deficits. The exposure can also lead to mood disturbances, including depression and anxiety.

124. DMS is a volatile, flammable liquid with a characteristic odor often described as that of cabbage or seafood. It is produced both naturally and industrially. Acute exposure can cause eye and skin irritation. Acute inhalation of DMS can cause irritation of the respiratory tract, leading to coughing and shortness of breath, along with irritation of the nose and throat. When high concentrations are ingested or inhaled, nausea and vomiting symptoms can occur. Long-term exposure to DMS has been associated with neurological symptoms such as headaches and dizziness and may exacerbate asthma or lead to asthma-like symptoms in sensitive individuals. Prolonged exposure to low levels of DMS can lead to chronic respiratory conditions, such as bronchitis, allergic reactions, chronic skin conditions, cognitive impairments, and other neurological issues.

## Damages

125. The releases of noxious odors, toxic landfill gases, and hazardous air contaminants from the Landfill, including, but not limited to, VOCs including benzene, SVOCs, NMOCs, methane, and sulfides, including $H_2S$ and DMS, have physically intruded, and continue to intrude, contaminated, and continue to contaminate, and have damaged, and continue to damage Plaintiffs' properties, interfere with Plaintiffs' property rights and harm Plaintiffs' health.

126. Defendants' actions and inactions in creating these conditions were a substantial

factor in causing Plaintiffs to suffer economic and non-economic damages unique to each Plaintiff (and different from damages suffered by other Plaintiffs).

127.    Plaintiffs have suffered and will continue to suffer damages and losses including a substantial decrease in the value and marketability of their properties; the need for and the cost of remediating their properties, including the cost of air filtration and cleaning up the contamination, and/or mitigation systems for those properties; relocation and alternative living expenses and other economic damages.

128.    Plaintiffs have suffered and will continue to suffer the loss of exclusive possession of their property.

129.    Plaintiffs have suffered, and will continue to suffer annoyance, interference, inconvenience, and discomfort.

130.    Plaintiffs have suffered and will continue to suffer, the loss of use and enjoyment of their properties, including, but not limited to, having to remain inside their homes and forego the use of their yards based on the offensive odors; having to keep doors and windows closed; and running air conditioning systems continuously when weather conditions otherwise would not so require.  Plaintiffs are reluctant to invite guests to their homes; and are experiencing physical discomfort, irritation and other respiratory symptoms.

131.    Additionally, due to their constant and ongoing exposure to the noxious odors, toxic landfill gases, and hazardous air contaminants from the Landfill, individual Plaintiffs suffered substantial physical discomfort and were sickened and injured.  Plaintiffs have experienced headaches, nose bleeds, nausea, lightheadedness, dizzy spells, eye irritation, respiratory issues, and other ailments.  In addition, Plaintiffs' mental health has been adversely impacted by the Defendants' tortious conduct, and Plaintiffs have suffered severe emotional distress and angst.

132.    Finally, continuous exposure to the noxious odors, toxic landfill gases, and hazardous air contaminants from the Landfill has manifested as personal injuries and/or chronic disease in certain Plaintiffs.

////

1  **CLAIMS ALLEGED**

2  **FIRST CAUSE OF ACTION**

3  **TRESPASS**

4  (Against All Defendants and Does 1 through 50)

5  133.    Plaintiffs incorporate by reference the allegations set forth in the paragraphs 1-132

6  as though fully set forth herein.

7  134.    Plaintiffs own and/or occupy, owned and/or occupied, or reside and/or resided at

8  real property near the Landfill.  Plaintiffs had/have a right to occupy, enjoy, and use their property

9  without interference from Defendants.

10  135.    As a result of the intentional and reckless and/or tortious conduct and activities of

11  Defendants, releases from the Landfill of noxious odors, toxic landfill gases, and hazardous air

12  contaminants including, but not limited to, VOCs including benzene, SVOCs, NMOCs, methane,

13  and sulfides, including $H_2S$ and DMS, have migrated beyond the boundary of the Landfill, and

14  physically intruded, and continue to physically intrude, and wrongfully entered, and continue to

15  wrongfully enter, the properties of Plaintiffs, thereby interfering with Plaintiffs' exclusive

16  possessory interest in their properties.

17  136.    Plaintiffs in no way consented or provided permission to these contaminants'

18  unlawful entry onto their properties.  Nor did Plaintiffs provide permission to Defendants to engage

19  in such conduct which resulted in the trespass.

20  137.    The physical intrusion of the noxious odors, toxic landfill gases, and hazardous air

21  contaminants has physically injured and damaged Plaintiffs' properties.  This would not have

22  occurred but for the actions and inactions of Defendants.

23  138.    Defendants' conduct was a substantial factor in causing the Reaction and as well as

24  the subsequent growth of the toxic releases from the Landfill.  Defendants' continuing trespass

25  was and continues to be a substantial factor in causing Plaintiffs to suffer harm.  The harm suffered

26  by Plaintiffs from the Reaction was, and continues to be, objectively foreseeable to Defendants

27  both in nature and in scope.  Defendants' conduct was an extreme departure from what a

28  reasonably prudent landfill operator would do in the same situation to prevent harm to neighboring

properties.

139.    As a direct, proximate, and foreseeable result of Defendants' trespass, Plaintiffs have suffered damages and losses including, but not limited to, the need for and the cost of remediation of their properties, diminution of the value and marketability of their properties and property rights, the loss of use of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance.  Additionally, Plaintiffs have suffered injuries to their physical and mental health.  Accordingly, Defendants are liable for compensatory damages to the Plaintiffs, to be determined, on an individual basis, according to proof at trial.

140.    Moreover, Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm.  This is despicable and oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety and property rights.

## **SECOND CAUSE OF ACTION**

### **PRIVATE NUISANCE**

(Against All Defendants and Does 1 Through 50)

141.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-132 as though fully set forth herein.

142.    Plaintiffs are in lawful possession of their property.

143.    Defendants owned, maintained, operated, and otherwise controlled the Landfill.

144.    Noxious odors, toxic landfill gases, and hazardous air contaminants have entered, and continue to enter, the properties of Plaintiffs.  These noxious odors, toxic landfill gases, and hazardous air contaminants originated, and continue to originate, from the Reaction and the associated LFG condensate and leachate emanating from the Landfill.

145.    Defendants caused these releases, failed to prevent these releases, failed to stop these releases, and failed to manage, monitor, maintain, repair, and operate the Landfill in a manner that would not harm Plaintiffs' properties and property rights.  Defendants' actions were

unreasonable to a person of ordinary prudence and discretion.

146.    The releases of noxious odors, toxic landfill gases, and hazardous air contaminants resulting from Defendants' acts and omissions, have caused, and continue to cause, a substantial and significant interference with Plaintiffs' use and enjoyment of their properties, including causing harm to Plaintiffs' properties and property rights.

147.    The noxious odors, toxic landfill gases, and hazardous air contaminants are offensive to Plaintiffs' olfactory senses and obstruct the free use of their properties, so as to substantially interfere with Plaintiffs' use and enjoyment of their properties.

148.    Defendants have failed to abate the effects of the releases from the Landfill, which have harmed, and continue to harm, the properties and property rights of Plaintiffs.

149.    Defendants' acts and omissions were, and are, intentional and unreasonable.  Even if certain of Defendants' acts and omissions were unintentional, they were negligent, reckless, and/or abnormally dangerous, and done with a conscious disregard of Plaintiffs' property and property rights.

150.    An ordinary person would reasonably be annoyed or disturbed by Defendants' act and/or omissions and by the offensive noxious odors, toxic landfill gases, and hazardous air contaminants that have contaminated Plaintiffs' properties.

151.    Plaintiffs did not consent to the noxious odors, toxic landfill gases, and hazardous air contaminants contaminating their properties.  Nor did Plaintiffs provide permission to Defendants to engage in such conduct which resulted in the nuisance.

152.    Defendants' substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property constitutes a private nuisance for which Defendants are liable to Plaintiffs.

153.    As a direct, proximate, and foreseeable result of Defendants' nuisance, Plaintiffs have suffered damages and losses including, but not limited to, the diminution in value and marketability of their properties, the loss of use of their properties, the need for and the cost of remediation of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance.  Additionally, Plaintiffs have suffered

injuries to their physical and mental health.  Accordingly, Defendants are liable for compensatory damages to Plaintiffs, to be determined, on an individual basis, according to proof at trial.

154.    Moreover, Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm.  This is despicable and oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety and property rights.

## THIRD CAUSE OF ACTION

### NEGLIGENCE

(Against All Defendants and Does 1 Through 50)

155.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-132 as though fully set forth herein.

156.    Defendants owed Plaintiffs a non-delegable duty of reasonable care in performing their management, maintenance, and operation of the Landfill and to minimize, mitigate, and remediate the impacts of their operation.  Defendants had a duty, in particular, to: (1) monitor the Landfill and any releases to avoid underground reactions; (2) identify the potentially harmful releases of noxious odors, toxic landfill gases, and hazardous air contaminants; (3) investigate and understand the characteristics of these releases; (4) conduct their operations in a manner that would not unreasonably endanger surrounding properties; (5) control, minimize, and eliminate releases from the Landfill; (6) investigate and remediate environmental releases that they knew posed a potential risk to neighboring properties; (7) shutdown operations to control, minimize, or eliminate the releases and further contamination of neighboring properties; (8) comply with the CUP and other Permits and regulatory requirements for safe and proper management of the Landfill; and (9) take action to correct and remediate all violations contained in the NOVs.

157.    Defendants, as owners, operators, and/or controllers of the Landfill owed a duty, pursuant to Civil Code § 1714(a), to act responsibly.  Therefore, Defendants must be held responsible for not only the results of their willful acts, but also for injury occasioned by their want of ordinary care or skill in the management of the Landfill.

158.    Defendants failed to exercise the degree of care which a reasonable and prudent person would use under similar circumstances.

159.    Defendants breached their duty of care to Plaintiffs by creating and allowing the release of noxious odors, toxic landfill gases, and hazardous air contaminants including, but not limited to, VOCs including benzene, SVOCs, NMOCs, methane, and sulfides, including $H_2S$ and DMS from the Landfill, by failing to take steps to minimize or eliminate these releases, and by failing to timely mitigate or remediate the impact and harm to Plaintiffs and their properties.

160.    It was reasonably foreseeable that failing to operate, manage, and monitor the Landfill in accordance with regulatory requirements, industry standards, and due care would result in emissions being released from the Landfill, that would migrate to neighboring properties, including the properties of Plaintiffs.

161.    Defendants' failure to exercise ordinary and reasonable care has directly and proximately caused the properties neighboring the Landfill to become contaminated with noxious odors, toxic landfill gases, and hazardous air contaminants.

162.    The harm to Plaintiffs was reasonably foreseeable to Defendants.

163.    As a direct, proximate, and foreseeable result of Defendants' negligence, Plaintiffs have suffered damages and losses including, but not limited to, the need for and the cost of remediation of their properties, the diminution in the value and marketability of their properties, the loss of use of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance.  Additionally, Plaintiffs have suffered injuries to their physical and mental health.  Accordingly, Defendants are liable for compensatory damages to the Plaintiffs, to be determined, on an individual basis, according to proof at trial.

164.    Moreover, Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm.  This is despicable and oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety and property rights.

///

COMPLAINT FOR DAMAGES

## **FOURTH CAUSE OF ACTION**

### **NEGLIGENCE PER SE**

(Against All Defendants and Does 1 Through 50)

165.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-132 as though fully set forth herein.

166.    At all times relevant hereto, California Health and Safety Code Section 41700 was in full force and effect.  The statute states, in relevant part that "(a) Except as provided in Section 41705, a person shall not discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or that endanger the comfort, repose, health, or safety of any such persons or the public, or which cause, or have a natural tendency to cause, injury or damage to business or property."

167.    Plaintiffs were among the class of persons that California Health and Safety Code Section 41700 was intended to protect.

168.    Defendants violated California Health and Safety Code Section 41700 by inadequately containing the LFG, leachate, and associated surface emissions at the Landfill.  South Coast AQMD has issued approximately 241 NOVs against the Landfill for public nuisance, in violation of the agency's Rule 402 and California Health and Safety Code Section 41700, including 19 NOVs from 2019 to 2022, and 222 from 2023 to the present.

169.    Defendants' violation of Code Sec 41700 was the direct and proximate cause of the incident(s) out of which this action arises and Plaintiffs' resulting damages.

170.    As a direct, proximate, and foreseeable result of Defendants' negligence per se, Plaintiffs have suffered damages and losses including, but not limited to, the need for and the cost of remediation of their properties, the diminution in the value and marketability of their properties and property rights, the loss of use of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance.  Additionally, Plaintiffs have suffered injuries to their physical and mental health.  Accordingly, Defendants are liable for compensatory damages to the Plaintiffs, to be determined, on an individual basis,

according to proof at trial.

171.    Moreover, Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm.  This is despicable and oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety and property rights.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT FAILURE TO WARN**

(Against All Defendants and Does 1 through 50, inclusive)

172.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-132 as though fully set forth herein.

173.    Defendants had a duty to exercise reasonable care with respect to their operation of the Landfill.

174.    Defendants, by their failure to use reasonable care operating the Landfill, created dangerous ETLF conditions at the Landfill that lead to the ongoing releases of toxic landfill gases and hazardous air contaminants from the Landfill.

175.    Though ETLF conditions were observed and recorded as early as 2019, Defendants did not correct the condition, allowed the condition to continue, with knowledge of the likelihood that the neighboring properties, including those of Plaintiffs, would be affected.

176.    Defendants had a duty to warn the Plaintiffs of the dangerous conditions that they created.

177.    Despite knowing this risk of harm as early as 2019, Defendants did not warn Plaintiffs of ETLF conditions, or of the ongoing releases of noxious odors, toxic landfill gases, and hazardous air contaminants that were contaminating the air and migrating to neighboring properties, including the properties of Plaintiffs, causing harm thereto, and recklessly kept this condition hidden from Plaintiffs, thus breaching their duty of care.

178.    The harm to Plaintiffs was reasonably foreseeable to Defendants.

179.    As a direct, proximate, and foreseeable result of Defendants' negligent failure to

COMPLAINT FOR DAMAGES

warn, Plaintiffs have suffered damages and losses including, but not limited to, the need for and the cost of remediation of their properties, the diminution in the value and marketability of their properties and property rights, the loss of use of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance. Additionally, Plaintiffs have suffered injuries to their physical and mental health. Accordingly, Defendants are liable for compensatory damages to the Plaintiffs, to be determined, on an individual basis, according to proof at trial.

180.    Moreover, Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety and property rights.

## SIXTH CAUSE OF ACTION

### UNJUST ENRICHMENT

(Against All Defendants and Does 1 through 50, inclusive)

181.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-132, as though fully set forth herein.

182.    Defendants made a choice to not expend money and obtain the best technology available to limit or prevent ETLF conditions and, later, the Reaction, and subsequent release of noxious odors, toxic landfill gases, and hazardous air contaminants. Defendants decided to forgo expenditures to prevent the contamination of neighboring properties, including those of Plaintiffs, despite being aware of the ETLF concerns since 2019. Despite the substantial increases in LFG and leachate releases resulting in emissions of noxious odors, toxic landfill gases, and hazardous air contaminants, Defendants continued to operate the Landfill, accept waste, and collect revenue, and continue to do so to today.

183.    Defendants have been unjustly enriched by not making the necessary expenditures to prevent the contamination of neighboring properties, including the properties of Plaintiffs, and by failing to ensure the integrity of the control systems in place at the Landfill and comply with

all applicable laws and regulations, as fully described herein.

184.   Defendants' refusal to incur necessary expenditures was at the cost of Plaintiffs' property rights and health.  The cost savings to Defendants, including monies saved by not properly monitoring and testing the emissions and GCCS wells, and by not implementing necessary corrective actions and controls, is a measurable monetary amount.  As early as 2018, Defendants received violation notices for failure to implement the proper gas collection and monitoring systems, as required by the permits as detailed herein.  Defendants failed to utilize available technology to properly monitor the conditions at the Landfill, let alone the best technology available to avoid the Reaction prior to May 2022.  Thereafter, Defendants failed to utilize the needed tools to abate the Reaction's effects, despite having knowledge regarding ETLFs and the steps needed to abate such conditions.

185.   Despite knowledge of the ETLF conditions in 2019, which grew increasingly worse through 2022, Defendants failed to employ the best available technologies, necessary mitigation measures, and corrective actions to control the ETLF conditions, in spite of knowledge of the increased leachate, toxic air emissions, and odors that ETLF conditions cause.  Defendants elected to forgo additional expenditures on the best available technologies, mitigation measures, and corrective actions rather than employ these technologies and measures to properly manage the conditions at the Landfill.

186.   On information and belief, in 2023 alone, the Landfill generated over six (6) million dollars in revenue, with WASTE CONNECTIONS US generating over two (2) billion dollars in sales and WASTE CONNECTIONS reporting $8.02 billion in revenue, consisting mainly of fees charged to customers for collection, transfer, recycling, and disposal of non-hazardous solid waste.

187.   Defendants have received a measurable monetary benefit by not making necessary expenditures to prevent the releases of noxious odors, toxic landfill gases, and hazardous air contaminants.  It would be unconscionable and contrary to equity for Defendants to retain these benefits.  The Court, therefore, should award an amount equivalent to the expenditures saved and the profits obtained by Defendants at the expense of Plaintiffs.

188.   Plaintiffs have suffered damages and losses including, but not limited to, the need

for and the cost of remediation of their properties, the diminution in the value and marketability of their properties, the loss of use of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance.  Additionally, Plaintiffs have suffered injuries to their physical and mental health.  as a direct consequence of Defendants' conduct.  Accordingly, Defendants are liable for compensatory damages to the Plaintiffs, including disgorgement for benefits obtained pursuant to Civil Code section 3334.

## SEVENTH CAUSE OF ACTION

### CIVIL CONSPIRACY

(Against All Defendants and Does 1 Through 50)

189.   Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-132 as though fully set forth.

190.   Defendants acted in concert with each other to conspire to defraud Plaintiffs.

191.   Defendants together, through their acts and omissions described above, and through the acts of other subsidiaries and affiliates, including consulting firms, not named as Defendants, conspired to perform unlawful acts or, in the alternative, did lawful acts in an unlawful way, and Defendants caused and/or contributed to the releases of noxious odors, toxic landfill gases, and hazardous air contaminants including, but not limited to, VOCs including benzene, SVOCs, NMOCs, methane, and sulfides, including $H_2S$ and DMS, from the Landfill, which invaded, and continue to invade, and harmed, and continue to harm, Plaintiffs' properties, property interests and health.

192.   At all times relevant, there existed a conspiracy between and among Defendants regarding the operation of the Landfill including, but not limited to, an agreement to, among other things, conceal the conditions at the Landfill and toxic releases created by Defendants, resulting in contamination of Plaintiffs' properties.  Defendants committed acts in furtherance of their conspiracy including, but not limited to, failing to utilize the best available technology to monitor and control the conditions at the Landfill, apparent in 2019 and prior to May 2022, and prevent the continued release of noxious odors, toxic landfill gases, and hazardous air contaminants from the Landfill.

COMPLAINT FOR DAMAGES

193. The agreement between the Defendants, as set forth herein, to do an unlawful act or to do a lawful act in an unlawful way was a direct and proximate cause of Plaintiffs' damages and losses including, but not limited to, the diminution in the value and marketability of their properties and property rights, the loss of use of their properties, the need for and the cost of remediation of their properties, lost use and enjoyment of their properties, and the associated interference, discomfort, inconvenience, and annoyance. Additionally, Plaintiffs have suffered injuries to their physical and mental health. Accordingly, Defendants are liable for compensatory damages to the Plaintiffs, to be determined on an individual basis, according to proof at trial

194. Moreover, Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety and property rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request and seek the following,

(a) For an award of compensatory damages jointly and severally against Defendants, including general damages for economic loss, to be determined on an individual basis according to proof;

(b) For an award of special damages severally against each Defendant;

(c) For an award for disgorgement of the profits and savings that were obtained by the unjust enrichment of Defendants at the expense of Plaintiffs;

(d) Injunctive relief requiring the Defendants to abate the nuisance;

(e) Reasonable attorneys' fees, costs and litigation expenses pursuant to California Code of Civil Procedure § 1021.5, and otherwise permitted by law;

(f) Pre-judgment and post-judgment interest;

(g) Punitive and exemplary damages against W-C DEFENDANTS, according to proof; and

(h) Such other relief as the Court shall deem just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues and causes of action.

Dated:  January 6, 2025                                SINGLETON SCHREIBER, LLP

                                            By:    */s/Knut S. Johnson*
                                                   Knut S. Johnson
                                                   Marianna Sarkisyan
                                                   *Attorneys for Plaintiffs*

Dated:  January 6, 2025                                TRIAL LAWYERS FOR JUSTICE, PC

                                            By:    */s/ Kelly Hanker*
                                                   Kelly Hanker
                                                   *Attorneys for Plaintiffs*

Dated:  January 6, 2025                                THE BRATT LAW FIRM, PC

                                            By:    */s/ Mark Bratt*
                                                   Mark Bratt
                                                   *Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES